UNITED CHROMIUM, Inc., v. KOHLER CO.

No. 742.

District Court, E. D. Wisconsin.

April 24, 1944.

Newton A. Burgess and Gustave R. Thompson, both of New York City, and Lecher, Michael, Spohn & Best and Gerritt Foster, all of Milwaukee, Wis., for plaintiff.

Charles H. Walker and Maxwell Barus both of New York City, and Lines, Spooner & Quarles and Louis Quarles, all of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This is an action for the alleged infringement of two Fink patents relating to chromium plating. U. S. Pat. 1,581,188, hereafter called the "Bath Patent", was granted April 20, 1926, on application filed December 19, 1925. U. S. Pat. 1,802,463, hereafter called the "Bright Plating Patent" was granted April 28, 1931, on application filed September 19, 1925.

The Bath Patent is for a "process of electro-depositing chromium and of preparing baths therefor." Claims 4, 6, 10, 13, 16 and 18 are in issue. In June, 1928, claims 4, 6, 10 and 13 in suit were amended by a disclaimer, which limited said claims to the step of maintaining the efficiency of the bath by regulating the radical component of the bath (other than, or in addition to, the chromic acid radical). The Bright Plating Patent is for a "process of producing chromium plated articles with mirror-like scratch-finish, or the like surfaces." All four claims of this patent are in issue.

The patents in suit have had previous litigation history. Three prior suits on the Bath Patent have been brought to trial. In the first suit, United Chromium, Inc., v. International Silver Co., D.C., 53 F.2d 390, there was a decree that the patent was valid and infringed. This was affirmed by the Circuit Court of Appeals for the Second Circuit, 60 F.2d 913. In the second suit, United Chromium, Inc. v. General Motors Corp. et al., D.C., 11 F.Supp. 694, again there was a finding that the patent was valid and infringed. This decision was reversed by the Circuit Court of Appeals for the Second Circuit, 85 F.2d 577, certiorari denied 300 U.S. 674, 57 S.Ct. 613, 81 L.Ed. 879. The court held that the patent was invalid on the Udy defense which had not been before the court in the International Silver Co. case. The third suit was before Judge Barnes in the Northern District of Illinois. United Chromium, Inc. v. Great Lakes Co.[1] The Bright Plating Patent was also before the court in that suit and it was there held that both patents were valid and infringed. Defendant appealed, but before the same could be heard, defendant took out a license, and the appeal was dismissed.

The function of a chromium plating bath is to deposit chromium electrolytically from solutions of chromic acid. The primary purpose of a catalyst in the bath is to assist in the deposition of chromium. An acid is composed of two parts, the first being hydrogen and the other being known as the acid radical. The Fink method requires that there be present in the bath one or more acid radicals which will act as a catalyst to aid the chromium to plate out of the chromic acid bath onto the article to be plated. The catalyst remains stable under the actions which occur when the electric current is passed through the bath.

---

[1] No opinion for publication.

Plaintiff does not claim that Fink was the first to electro-deposit chromium. The patent itself states: "For nearly a century there has appeared in the literature considerable matter in respect to chromium plating * * *." Plaintiff does claim, however, that Fink was the first to provide "a practical, reliable and commercially available process for electro-depositing chromium from chromic acid solutions." Plaintiff contends that before Fink, there was not available a process of electro-plating chromium which satisfied the test of actual commercial requirements.

Chrome plating is so commonplace today that it is difficult to visualize the situation in the art prior to 1924. The desirability and utility of chrome plating was generally recognized. Many competent scientific men had worked to solve the problem of discovering a commercially successful process. Earlier platers would get good results with a bath, but after a short period of use, poor results would be obtained. They did not know how to properly control the bath.

Fink taught that the important criterion for bath composition was the ratio of the chromic acid to the total catalyst acid radicals, and that it was essential to keep this ratio within definite limits. The patent discloses that it is the total of the catalyst acid radicals present in the bath, whether of one kind or another, that must be taken into account. Plaintiff states its contention thus: "Whether any one acid radical, or a mixture of such radicals, is used as a catalyst, it is always true (as the Fink Patent teaches) that the radical (catalyst) is necessary for the deposition of chromium, that it has to be within limits, that it requires regulation for continuous operation, and that this regulation is accomplished by maintenance of the ratio of chromic acid to the total catalyst acid radical content of the bath."

When a chrome plating bath is in use, changes are constantly occurring in its composition. As plated articles are taken out of the bath, there is a loss of solution known as "drag-out". When such a bath is in operation a mist or spray is formed above it and is removed by a ventilating system. This is called "spray-loss". Thus, not only chromic acid but also catalyst acid radicals are taken from the bath. Furthermore, each addition of chromic acid to the bath, as well as acid-cleaning solutions adhering to the articles to be plated, cause changes in the bath due to "drag-in". It

was this constant change in ratio between the chromic acid and the catalyst that bewildered the workers in this field before Fink. In fact, for some time Fink worked in the dark. Fink's discovery arose out of his analyses in April, 1924, of the chromic acid which he was then using in bath No. 60, and two other chromic acids, and from his plating tests in May, 1924, with solutions made up with these chromic acids. At this time Fink had knowledge not only of a solution of approximately optimum composition (bath No. 60), but also knowledge of the rough limits of the ratio between chromic acid and the catalyst acid radicals. Fink thus developed a dependable process satisfactory for commercial use. "While a scientific truth, or the mathematical expression of it, is not a patentable invention, a novel and useful structure created by the aid of knowledge of scientific truth may be." Mackay Radio & Telegraph Co. v. Radio Corp., 306 U.S. 86, 94, 618, 59 S.Ct. 427, 431, 83 L.Ed. 506.

Fink teaches that it is the totality of the catalyst acid radicals in the bath which must be considered in the ratio between the chromic acid and the catalyst. The patent suggests that this total catalytic effect may be arrived at by making a chemical analysis for each catalyst acid radical and determining its sulphate equivalent, and then adding up these equivalents to get the total catalyst expressed as $SO_4$. While Fink used $SO_4$ as an example, he recognized that other acid radicals such as borate, fluoride and phosphate could be used as catalysts.

Fink teaches that the total of the catalytic agents, whether of one kind or another, that are actually in the bath, must be computed and included, whether originally in the chromic acid, in the catalytic agent, or otherwise entering the bath. The patent teaches the user how to meet any trouble that might arise from the unexpected appearance of catalyst acid radicals not normally present in the bath.

Fink discovered that for successful commercial plating not only must the catalyst acid radical be regulated at the start, but that throughout the operation, the ratio of the chromic acid and the catalyst acid radical $\dfrac{CrO_3}{SO_4}$ must be maintained within definite limits, and preferably at $\dfrac{100}{1}$.

The complete method of Fink's claims requires that the totality of the catalyst acid

radicals is to be taken into account; then the establishment of the ratio of the chromic acid to the totality of the catalyst within narrow limits; and the regulation of that ratio in continuous operation.

■ Although defendant contends the patent is void because the claims in suit are broader than the disclosure, and that they are also void because of indefiniteness, I conclude the patent is valid if Fink was the first inventor.

In the General Motors decision, written by Judge Manton, 85 F.2d 577, the court held that the patent was invalid because of Udy. The court there said, 85 F.2d at p. 579: " * * * We are satisfied that there was prior invention established by the evidence of Udy's knowledge, practice, and prior patent application." Judge Thomas in the District Court, in the General Motors case, and Judge Barnes in the Great Lakes case, reached a contrary conclusion.

Udy as an employee of Electro Metallurgical Company commenced his work on electrolytic chromium in 1922 and filed a patent application in 1924. He assigned his rights to his employer. Shortly after Fink's patent issued, Udy's patent application was amended by copying eleven of Fink's claims. An interference was declared. Then the company owning the Fink patent and the company owning the Udy application merged to form the plaintiff, who thus became the owner of both. It was necessary for plaintiff to decide for itself the question of priority. This question was submitted to two reputable attorneys of high standing, who, after several months' consideration, decided favorably to Fink. Udy then signed a concession of priority, but did so under protest. The Udy application was thereafter abandoned. It might be noted that it would have been to the advantage of plaintiff to have had a patent issue on the Udy application, if it had disclosed the Fink invention, since the monopoly would have extended two years longer, and there would have been an advantage in Udy's earlier filing date.

During the course of his work, Udy rendered voluminous reports to his superiors. Extracts and excerpts from these writings can be gathered together so as to give some plausibility to defendant's contention that Udy first had the Fink invention. However, an examination of these reports as a whole demonstrates that he missed the heart of Fink's disclosures.

Udy did not have the concept that there were acid radicals other than $SO_4$ which would serve as catalyst. Therefore, he gave no warning to watch out for other radicals, either by keeping them out of the bath or by taking them into account in the totality of the catalyst. A bath might be made up, having an amount of $SO_4$ specified in Udy's formula, and yet it might not work because of the presence of other catalyst acid radicals, for which his method makes no provision.

While Udy did specify limits of sulphuric acid concentrations and limits of chromic acid concentrations, he did not have the concept of maintaining a fixed ratio within limits between these concentrations. The ratio that Udy had in mind was of hexavalent chromium to trivalent chromium, and sulphate to trivalent chromium.

There was no reduction of practice by Udy of Fink's entire process. I am convinced that prior to Fink, Udy did not operate a chromium plating bath by the method stated in Fink's claims.

The Manhattan defense, which is much stressed by defendant, is predicated on activities started late in 1923 by the Manhattan Electrical Supply Co. They carried on some experimental work in chrome plating of tools used in connection with a washer-type dry battery. There has been no publication either in scientific articles or in patents of Manhattan's activities in chrome plating.

The fact that the Manhattan experimenters tried to remedy the difficulties they were constantly encountering, by adjusting the trivalent chromium in their baths, although permitting the $SO_4$ content to vary greatly, is convincing proof that they did not have the Fink claimed invention. They had no appreciation of the importance of the acid radical concentration or of the ratio of chromic acid to catalyst acid radicals. Their analyses for $SO_4$ were merely a measure for the excess trivalent chromium which was the center of their attention. I conclude that Manhattan did not anticipate.

Defendant has cited other prior art, including the Sargent Article of April 8, 1920; the Grube Patent, U. S. No. 1,496,-845, and the Pierce and Humphries Patent, U. S. No. 1,545,196. All references to the prior art have been carefully considered and are held not to anticipate Fink.

■ Defendant argues that the disclaimers invalidate the claims of the bath

patent. But these claims relate to the composition of the bath, and the disclaimers merely require that this composition be maintained by continued adjustments as long as the bath is used. This does not add a new element to the method of chrome plating. The regulating which is required by the disclaimers is not any part of the chromium plating operation. After the bath has been in use for a while, the composition changes, and then the same procedure is used as that in making up the bath originally, that is, add to or subtract from the quantity of the radicals in the solution, the amount necessary to bring the total amount up to or down to specified limits.

As each claim in suit reads on defendant's method of chrome plating, I conclude that the claims in suit of the bath patent are valid and infringed.

### Bright Plating Patent

U. S. Patent No. 1,802,463 relates to "chromium-plated articles having mirror-like image-reflecting surfaces, scratch-finish surfaces and the like, and to the processes of producing the same." The patent provides a graph in which there are two primary areas, circumscribed by the dot and dash line "A" and the dotted line "B". These areas which overlap to some extent are enclosed by a line "X" to form one area. In the graph, the ordinates indicate temperatures in degrees centigrade and the abscissas indicate current density in amperes per square inch. The area within line "A" gives the preferred co-ordination of temperature and current density for a solution containing two hundred fifty grams per liter of chromic acid and 2.5 grams per liter of sulphuric acid. The area circumscribed by line "B" has double the catalyst with a corresponding doubling of the chromic acid solution.

Although Fink filed the application for his Bright Plating Patent three months before he filed the application for the Bath Patent, the latter was not only issued first, but some five years prior to the date of the Bright Plating Patent. The term of the Bath Patent expired April 20, 1943, and the public is free to use the bath composed and maintained as disclosed in that patent.

There was no invention in preparing a bright or ornamental surface on an article to be plated, so that the article after plating would have a finish of the underlying surface. This was old in the art. Likewise, temperatures and current densities suitable for bright plating were known at the time that Fink filed his Bright Plating application. The difficulty in successful commercial operation was in the composition and maintenance of the bath.

Plaintiff states, "The first step of the method in the second Fink patent and the foundation on which this method rests is the preparation and maintenance of a chromium plating bath in accordance with the first Fink (bath) patent."

■ Plaintiff asserts the right under the Bright Plating Patent to continue to monopolize the use of the processes of the now expired Bath Patent for an additional five years whenever such process is used for such bright plating. This it cannot do. The rights which Fink had in a bath composed and maintained as described in the Bath Patent, were exhausted when that patent expired. Saranac Automatic Mach. Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634.

The original Bright Plating Patent contained nothing about maintaining the bath to a stated formula by analyses or otherwise. The Patent Office repeatedly rejected all of Fink's claims until five years later when he inserted limitations of maintaining the bath as described in his previously issued Bath Patent. When this amendment was added on November 17, 1930, it was more than two years after the method was in general public use, and after the defendant had made use of same.

■■ The preparation and maintenance of the bath as disclosed in the Bath Patent was not disclosed in the original application for the Bright Plating Patent, and that application affords no basis for such claims. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57, 573, 59 S.Ct. 8, 83 L.Ed. 34. I therefore conclude that the Bright Plating Patent is invalid. Attorneys for the plaintiff may submit proposed findings as to the Bath Patent, and attorneys for the defendant may submit proposed findings as to the Bright Plating Patent.